UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------X

JPS ELASTOMERICS CORP.,                    Docket No. 04-11816-RWZ

          Plaintiff,

  -against-

MATTEL, INC.,

          Defendant.

---------------------------------------------------------------X

---

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OTHER INJUNCTIVE RELIEF

---

Sauer & Wagner LLP
1801 Century Park East
Suite 520
Los Angeles, CA 90067
(310) 712-8100


Petrie | Schwartz LLP
500 Boylston Street
Suite 1860
Boston, MA 02116
(617) 421-1800
Attorneys for Defendant
Mattel, Inc.

# **TABLE OF CONTENTS**

                                                                                                           **Page**

Table of Authorities ................................................................... ii

Preliminary Statement .................................................................. 1

Brief Factual History ................................................................... 2

Brief Procedural History ................................................................ 4

Argument .............................................................................. 5

    I.    This Court Lacks Subject Matter Jurisdiction Over the Dispute ......... 5

    II.   No Temporary Restraining Order Should Issue as JPS Will Suffer
          No Harm If the Requested Relief Is Not Granted ..................... 6

    III.  No Temporary Restraining Order Should Issue as
          it is Highly Unlikely That JPS Will Prevail on the Merits of its Claim .... 7

    IV.  Any Minimal Harm Suffered by JPS If the Injunctive
          Relief Is Denied Will Be Far Outweighed by the Harm to
          Mattel If Granted .............................................. 9

Conclusion   ......................................................................... 11

# TABLE OF AUTHORITIES

**Federal Cases**

Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151 (1st Cir. 2004) ........ 6

Levesque v. State of Maine, 587 F.2d 78 (1st Cir. 1978) ............................ 6, 9

Richard C. Young & Co., Ltd., v. Leventhal, 298 F.Supp.2d 160 (D. Mass. 2003) ...... 8

**State Cases**

Jacobson v. Mailboxes, Etc. U.S.A., Inc., 419 Mass. 572 (1995) .................... 8

**Statutes**

28 U.S.C. § 1332(a)(2) ................................................................ 5

## PRELIMINARY STATEMENT

The *ex parte* application of Plaintiff JPS Elastomerics Corp. ("JPS") for a temporary restraining order must be denied for several reasons. First, this Court lacks subject matter jurisdiction as Defendant Mattel, Inc. ("Mattel") and JPS are both Delaware corporations. Second, JPS has not shown, and cannot show, that it will suffer irreparable harm if it is forced to wait for its preliminary injunction motion to be heard. Simply put, there is no emergency requiring issuance of a temporary restraining order. Rather, JPS's motion for a preliminary injunction should be heard on regular statutory notice.

Third, the likelihood that JPS ultimately will prevail on the merits of its claim that arbitration be conducted by the American Arbitration Association ("AAA") in Boston is very small. As discussed in detail below, JPS conceals a critical fact from the Court: JPS is only one of many respondents in the underlying arbitration, which arises from a dispute between Mattel and Choate Construction Company ("Choate") of Georgia, the entity Mattel hired to design and construct a large distribution center in Kentucky (the "Distribution Center"). Also submitting to the arbitration are Mid-South Roof Systems ("Mid-South") of Georgia, the subcontractor hired by Choate to furnish and install the roof of the Distribution Center; and East Coast Systems, Inc. ("East Coast") of Florida, the subcontractor that actually installed the roof. Of course, none of the other participants in the arbitration, *i.e.*, Choate, Mid-South or East Coast, has any written agreement or obligation to arbitrate against JPS in Boston. Indeed, this is the classic case of the tail wagging the dog. If JPS chooses to be involved in this arbitration, it cannot dictate the venue for all the other parties.

Fourth, any harm that might result to JPS if the arbitration takes place in Kentucky is far outweighed by the hardship that will be inflicted on Mattel should the injunction issue. It is

difficult, if not impossible, to determine how JPS will be harmed *at all* by participating in an arbitration in Kentucky, rather than Boston, let alone what harm will befall JPS if it is forced to wait the few weeks until the Court can schedule a preliminary injunction hearing. In contrast, Mattel will suffer severe, irreparable damage if it has to arbitrate against JPS in Boston and against the remaining respondents in Kentucky, as the exact same issues would be covered in both arbitrations, and witnesses and experts would have to appear twice rather than once. This would cause considerable, unnecessary, unrecoupable expense to Mattel and could result in inconsistent rulings on identical issues.

In summary, JPS fails to meet the criteria necessary for the issuance of a temporary restraining order, and its application must be denied.

## BRIEF FACTUAL HISTORY[1]

In September 1997, Mattel and Choate entered into a written agreement whereby Choate was to design and construct a 812,300 square foot distribution center for Mattel in Murray, Kentucky. [Demand for Arbitration ("Demand"), p. 3.] In constructing the Distribution Center, Choate utilized a mechanically-attached, thermoplastic polyolefin roof system manufactured by JPS. [Demand, p. 3.] The roof membrane is covered by a 20-year material warranty issued by JPS which expires on August 25, 2018.[2] In addition, JPS issued a 15-year warranty whereby it agreed to repair any leaks in the roof for a period of 15 years, ending on August 25, 2013. Choate subcontracted with Mid-South for installation of the roof. Mid-South was approved by

---

[1] These facts are taken directly from Mattel's Demand for Arbitration which is before this Court as Exhibit "B" to the Affidavit of Steven Moskowitz in Support of Application to Compel Arbitration in Boston ("Moskowitz Affidavit").

[2] JPS make no mention of this warranty in its moving papers, presumably because it has been unable to locate a fully executed copy.

2

JPS. JPS observed and approved of the installation conducted by Mid-South and/or its subcontractor, East Coast. [Moskowitz Affidavit, ¶¶ 13 and 14.]

Mattel took possession of the Distribution Center in April 1998. Almost immediately, Mattel noticed that the roof was leaking. As the rainy season approached, the leaks were increasing to the point where there were often more than 100 active leaks at any given time. In addition, Mattel employees noticed the roof lifting 6 to 8 inches during high winds. [Demand, p. 3.]

From the time that it first noticed leaks to November 2002, when Mattel ceased operations at the Distribution Center, Choate and JPS were actively involved in trying to determine why the roof was leaking. During this time, JPS mapped the leaks and attempted to repair them. When a new leak was reported, the areas were located, marked and patched with caulk. However, after each rain, new leaks would appear, and purportedly repaired leaks would leak anew. Mattel was in a constant battle to keep its office and warehouse areas dry. Acoustic ceiling tiles were constantly crumbling and collapsing due to water saturation. Water would pool in light fixtures and on the floor of offices and the warehouse. Carpets were soaked and had to be cleaned. At one point entire rows of finished product collapsed and had to be repackaged due to rainwater penetration through the roof. [Demand, pp. 3-4.]

Over 1,000 leaks have been mapped at the Distribution Center. At one point, water leaked into the power box, setting off the alarm system. There are water stains on the wall. There is significant damage to the office areas. Water continuously runs down the walls during and after rains. In fact, certain of the fire alarm panels had to be covered with plastic to protect them from roof leak water. The roof is in a constant state of deterioration, evidencing that this is an ongoing problem. Mattel has been unable to sell the building due to the defective roof and the

3

damage to the Distribution Center caused by the leaks. [Demand, p. 4.] As a result, it recently determined that it had no choice but to replace the entire roof, and has initiated that process.

## BRIEF PROCEDURAL HISTORY

Mattel filed its claim for arbitration in October 2003, nearly one year ago, naming as respondents both Choate and JPS. Since that time, Mid-South and East Coast agreed to participate in the arbitration proceedings. In hopes of reaching a quick resolution of this dispute, the parties agreed to stay the arbitration proceedings in order to pursue mediation. Due to the number of parties involved and their locations throughout the United States, it was difficult to set a mediation date. Upon the agreement of all parties, including JPS, the mediation was held in Louisville, Kentucky on May 7, 2004. The mediation was unsuccessful.

On May 12, 2004, Mattel's counsel informed the AAA that the stay should be lifted. Thereafter, on May 18, 2004, the AAA asked the parties to begin the process of selecting an arbitrator. [*See* the letter from the AAA dated May 18, 2004, attached as Exhibit "B" to the Affidavit of Neal M. Eiseman in Support of Application to Compel Arbitration in Boston ("Eiseman Affidavit").] In a letter dated June 4, 2004, the AAA informed the parties that the AAA is authorized to fix the locale of the arbitration if the parties are unable to agree. The parties were further directed to fax their complete "locale contentions" to the AAA by June 8, 2004, and were warned that the AAA's locale determination would be "final and binding." [A copy of the June 8, 2004 letter is attached as Exhibit "D" to the Eiseman Affidavit.] Each of the parties, including JPS, responded to the AAA's request. The AAA carefully considered the parties contentions and determined that the administration of the matter shall be conducted by the Southeast Case Management Center in Atlanta, Georgia and that hearings will be held in Louisville, Kentucky. Notification of its decision was sent to all parties via facsimile

4

transmission on July 2, 2004. [A copy of the July 2, 2004 is attached as Exhibit "F" to the Eiseman Affidavit.]

On August 6, 2004, the parties were sent a roster of potential arbitrators from the AAA's Southeast Case Management Center and were instructed to strike any names objected to and return the list no later than August 23, 2004. [A copy of the August 6, 2004 letter is attached as Exhibit "G" to the Eiseman Affidavit.] JPS's counsel then requested an extension of time to return the list to the AAA . The AAA granted his request, allowing all parties until August 30, 2004 to return the list of potential arbitrators, having stricken those to which objection was made. In the August 6, 2004 letter, the AAA makes it clear that these arbitration proceedings have literally just begun; no panel has yet been selected. On the present schedule, sometime in late August or early September the AAA will compare the returned lists from each party, remove all stricken names, and then determine if it can choose a panel from the remaining names. Once a panel has been appointed, a *preliminary* hearing will be set. In other words, the actual arbitration will not occur for at least several months, making JPS's application for a temporary restraining order particularly puzzling. There is more than sufficient time for a hearing on a preliminary injunction to be heard on regular notice, without the need for emergency measures.

## ARGUMENT

I. <u>THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THE DISPUTE.</u>

JPS purports to invoke this Court's diversity jurisdiction under 28 U.S.C. § 1332 as the basis for its complaint and temporary restraining order application. Yet the facts are clear that no diversity exists, as both JPS and Mattel are Delaware corporations.[3] As JPS and Mattel are not

---

[3] *See* paragraph 1 of JPS's Complaint for Injunctive Relief, in which it states that it is a Delaware corporation; and the Demand For Arbitration attached as Exhibit "B" to the Moskowitz Affidavit, wherein the caption states that Mattel is a Delaware corporation.

5

citizens of different states, no diversity exists. 28 U.S.C. § 1332(a)(2). Moreover, the complaint states no other basis for this Court's jurisdiction and this action should be dismissed forthwith.

In addition to the lack of subject matter jurisdiction, no temporary restraining order should issue for each of the reasons discussed below.

II.   NO TEMPORARY RESTRAINING ORDER SHOULD ISSUE AS JPS WILL SUFFER NO HARM IF THE REQUESTED RELIEF IS NOT GRANTED

As JPS admits in its moving papers, it shoulders the burden of showing that irreparable harm is likely to occur if the temporary restraining order is not granted.[4] "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

JPS wholly failed to meet its burden. In fact, the only attempt it makes to even address its burden is one sentence, in which it states: "JPS would suffer immediate, irreparable harm in that the arbitration would proceed in Louisville, thereby nullifying [the] parties' forum-selection clause and rendering the instant court application moot." [Moving Papers, pp. 7-8.] This statement, of course, sheds no light on why a temporary restraining order should be issued. Rather, it refers to why a *preliminary injunction* should issue to halt the arbitration proceedings altogether. JPS wholly fails to explain why the status quo must be preserved before its motion for preliminary injunction is heard.

JPS fails to inform the Court that there is no emergency need to maintain the status quo, as evidenced by the following two facts. First, JPS requested a continuance of the arbitrator

---

[4]   *See Levesque v. State of Maine*, 587 F.2d 78, 80 (1st Cir. 1978)(plaintiff's burden in obtaining temporary restraining order is to prove: likelihood of success on merits, irreparable harm, promoting public interest and no irreparable harm to defendant.)

6

selection date from August 23, 2004 to August 30, 2004. That continuance has been granted. Accordingly, there is no emergency currently before the Court and no need to preserve the status quo. As the arbitrators will not be selected until August 30, 2004, *at the earliest*, there is no possibility that the arbitration itself will be actually conducted prior to the time a regularly noticed motion for preliminary injunction could be heard.[5]

Second, JPS has known since July 2, 2004 that the AAA had chosen Louisville as the venue for the arbitration. JPS provides no explanation as to why it did not immediately notice a motion for preliminary injunction at that time, or at any time prior to filing its TRO papers. Accordingly, the present so called "emergency" is entirely due to JPS's lack of diligence and it should not be rewarded by extraordinary relief.

In summary, the application for a temporary restraining order must be denied because there is no need to preserve the status quo pending the hearing of a request for the Court to issue a preliminary injunction. The selection of the arbitrators can proceed as scheduled with no harm to JPS; and JPS's motion for preliminary injunction can be heard on regular notice long before the date for the arbitration hearing is even set in the AAA proceedings.

### III. NO TEMPORARY RESTRAINING ORDER SHOULD ISSUE AS IT IS HIGHLY UNLIKELY THAT JPS WILL PREVAIL ON THE MERITS OF ITS CLAIM

As discussed above, JPS cannot possibly succeed on the merits due to the lack of diversity jurisdiction. In addition, it will not prevail for the following reasons. Under

---

[5] JPS's argument that it cannot participate in the selection process without waiving its rights is disingenuous at best. JPS's counsel has consistently reserved JPS's rights with respect to the arbitration in all correspondence to the AAA. [*See*, Eiseman Affidavit ¶9.] JPS fails to explain why it cannot participate in the selection process under the same reservation of rights.

Massachusetts law, forum selection clauses are to be enforced if it is fair and reasonable to do so. *Jacobson v. Mailboxes, Etc. U.S.A., Inc.*, 419 Mass. 572, 574-575 (1995). Here it would be neither fair nor reasonable to require parties from California, Georgia and Florida to arbitrate in Massachusetts a construction dispute over a building in Kentucky. Unlike the case of *Richard C. Young & Co., v. Leventhal*, 298 F.Supp.2d 160 (D. Mass. 2003), relied on heavily by JPS, JPS is but one player in this dispute, which is multilateral and involves entities from multiple states, *none of whom, apart from Mattel has any contractual relationship with JPS.*

In determining the appropriate locale for this arbitration, the Court should take into account that the ***primary*** contract at issue is between Mattel and Choate. The relevant provisions in that contract include the following:

- Paragraph 6.05B. of the Standard General Conditions of the contract between Mattel and Choate states that Choate shall be fully responsible to Mattel for all acts and omissions of the *subcontractors and suppliers* on the project, such as JPS.

- Paragraph 6.05D. states that all services and materials provided to Choate by a *subcontractor or supplier,* such as JPS, will be pursuant to an appropriate Construction Subagreement, which specifically binds the subcontractor to the applicable terms and conditions of the contract documents for the benefit of Mattel.

- Exhibit GC-A to the Standard General Conditions relates to dispute resolution. Subparagraph C. requires binding arbitration *but does not include a forum selection clause.* Subparagraph F. states that if the claim or dispute involves the work of a subcontractor *or a supplier*, Mattel or Choate may join the subcontractor *or supplier* as a party to the arbitration. It further states that Choate shall include in all subcontracts required by Paragraph 6.05D. a specific provision whereby the subcontractor consents to being joined in arbitration between Mattel and Choate involving the work of the subcontractor.[6]

---

[6] The agreement between Mattel and Choate was attached as Exhibit "A" to Mattel's Demand for Arbitration, which is attached as Exhibit "B" to the Moskowitz Affidavit. However, JPS failed to include the attached agreement in its submission to this Court. For the Court's convenience, true and correct copies of the relevant contractual provisions are attached hereto.

8

Based on these provisions, Mattel could have brought a demand for arbitration solely against Choate. Choate could then have demanded that its subcontractor, Mid-South, join in the arbitration. Mid-South, in turn, could have demanded that its supplier, JPS, participate. Certainly, JPS could not argue that the entire arbitration be held in Boston, based on its boilerplate contract with Mattel. To compel such a result would be both unfair and unreasonable, in contrast to established Massachusetts law.

Moreover, it is important to note that this is an ongoing arbitration, which was initiated in October 2003, nearly eleven months ago. The parties have informally exchanged certain information, have conducted extensive tests on the roof of the Distribution Center, and have participated in a mediation held in Louisville, Kentucky. It would be counterproductive to now split the process in two, and begin a new arbitration proceeding in Boston, just between Mattel and JPS.[7] In summary, it would be unfair and unreasonable to enforce the forum selection clause, based on any of the reasons discussed above. Accordingly, JPS has not demonstrated a strong likelihood of prevailing on the merits, and its application must be denied.

IV. <u>ANY MINIMAL HARM SUFFERED BY JPS IF THE INJUNCTIVE RELIEF IS DENIED WILL BE FAR OUTWEIGHED BY THE HARM TO MATTEL IF GRANTED</u>

In seeking a temporary restraining order, JPS is also required to demonstrate that no irreparable harm will befall Mattel. *Levesque v. State of Maine, supra*, 587 F.2d at 80. As

---

[7]     In opposing JPS's motion for preliminary injunction, Mattel intends to raise additional arguments that are not raised here, including, without limitation arguments based on the doctrine of *forum non conveniens* and on the fact that the injury Mattel sustained arose long before the warranty was signed, such that the forum selection clause should not be enforced. Mattel expressly reserves its rights to raise any and all additional arguments against the issuance of a preliminary injunction in its opposition thereto.

9

previously noted, any harm to JPS were the arbitration to proceed in Louisville would be *de minimus*. JPS is a national company which regularly operates far beyond the borders of Massachusetts. This case is not document intensive. It will turn largely on the testimony of expert witnesses as to causes of the roof's failure. The only potential damage that JPS will suffer is travel costs for certain of its witnesses, at most. In contrast, the damage Mattel will suffer if the injunctive relief is granted will be both severe and irreparable.

What JPS intends to do is to shear itself off from the underlying arbitration, to force Mattel to arbitrate against it separately in Massachusetts. Should this be allowed, Mattel will be forced to arbitrate its case twice, in two separate forums, running the real risk of inconsistent results. It makes no sense to arbitrate the matter with less than all parties present. Each of the respondents should be heard together, in order that the arbitrator can properly assess liability among them. It is possible that Mattel will, in essence, be "deprived of its day in court" if JPS is not present at the arbitration in Louisville, as the arbitrator may decide he/she cannot determine the case on the merits without the attendance of JPS. Similarly, JPS could avoid liability in a separate arbitration in Boston by arguing that the roofer or builder is responsible for the roof failure. Clearly such a result would be catastrophic for Mattel, the injured party who bears no liability whatsoever for the roof failure.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court (1) dismiss this action as lacking subject matter jurisdiction; or (2) deny JPS's application for a temporary restraining order in its entirety; and (3) set JPS's motion for preliminary injunction on regular notice.

Dated: August 25, 2004

Respectfully Submitted,

By: _____
Laurie B. Hiller
Sauer & Wagner LLP
1801 Century Park East
Suite 520
Los Angeles, CA 90067
(310) 712-8100
(310) 712-8108 (fax)

By: _____
Irwin Schwartz (BBO# 548763)
Petrie | Schwartz LLP
500 Boylston Street
Suite 1860
Boston, MA 02116
(617) 421-1800
(617) 421-1810 (fax)
Attorneys for Defendant Mattel, Inc.

11

## CERTIFICATE OF SERVICE

I, Irwin Schwartz, attorney for Defendant Mattel, Inc., hereby certify that on this 25th day of August, 2004, I served a copy of the foregoing document on Plaintiff's attorneys by delivering the same, via courier to:

David D. DiCicco
Powers, DiCicco & Sahagian
Lynnfield Woods Office Park
Lynnfield, Massachusetts 01940

                                              Irwin B. Schwartz

6.05 *Concerning Subcontractors, Suppliers and Others*

A. DESIGN/BUILDER shall not employ any Subcontractor, Engineer, Supplier or other individual or entity against whom OWNER may have reasonable objection. DESIGN/BUILDER shall not be required to employ any Subcontractor, Engineer, Supplier or other individual or entity to furnish or perform any of the Work against whom DESIGN/BUILDER has reasonable objection.

B. DESIGN/BUILDER shall be fully responsible to OWNER for all acts and omissions of the Subcontractors, Engineers, Suppliers and other individuals or entities performing or furnishing any of the Work under a direct or indirect contract with DESIGN/BUILDER. Nothing in the Contract Documents shall create for the benefit of any such Subcontractor, Engineer, Supplier or other individual or entity any contractual relationship between OWNER and any such Subcontractor, Engineer, Supplier or other individual or entity, nor shall it create any obligation on the part of OWNER to pay or to see to the payment of any moneys due any such Subcontractor, Engineer, Supplier or other individual or entity except as may otherwise be required by Laws and Regulations.

C. DESIGN/BUILDER shall be solely responsible for scheduling and coordinating Subcontractors, Engineers, Suppliers and other individuals and entities performing or furnishing any of the Work under a direct or indirect contract with DESIGN/BUILDER. DESIGN/BUILDER shall require all Subcontractors, Engineers, Suppliers and such other individuals and entities performing or furnishing any of the Work to communicate with the OWNER through DESIGN/BUILDER.

D. All services performed or provided to and material and equipment supplied to DESIGN/BUILDER by a Subcontractor or Supplier will be pursuant to an appropriate Design Subagreement or Construction Subagreement between DESIGN/BUILDER and the Subcontractor, Engineer or Supplier which specifically binds the Subcontractor, Engineer or Supplier to the applicable terms and conditions of the Contract Documents for the benefit of OWNER. Whenever any such agreement is with a Subcontractor, Engineer or Supplier who is listed as an additional insured on the property insurance provided in paragraph 5.04.A or 5.04.B, the agreement between the DESIGN/BUILDER and the Subcontractor, Engineer or Supplier will contain provisions whereby the Subcontractor, Engineer or Supplier waives all rights against OWNER, DESIGN/BUILDER, OWNER's Consultants and all other additional insureds for all losses and damages caused by any of the perils or causes of loss covered by such policies and any other property insurance applicable to the Work. If the insurers on any such policies require separate waiver forms to be signed by any Subcontractor, Engineer or Supplier, DESIGN/BUILDER will obtain the same.

6.06 *Patent Fees and Royalties*

A. DESIGN/BUILDER shall pay all license fees and royalties and assume all costs incident to the use in the performance of the Work or the incorporation in the Work of any invention, design, process, product or device which is the subject of patent rights or copyrights held by others. If a particular invention, design, process, product or device is specified in the Conceptual Documents for use in the performance of the Construction and if to the actual knowledge of OWNER its use is subject to patent rights or copyrights calling for the payment of any license fee or royalty to others, the existence of such rights shall be disclosed by OWNER in the Conceptual Documents. To the fullest extent permitted by Laws and Regulations, DESIGN/BUILDER shall indemnify and hold harmless OWNER, from and against all claims, costs, losses and damages (including but not limited to all fees and charges of engineers, architects, attorneys and other professionals and all court or arbitration or other dispute resolution costs) arising out of or resulting from any infringement of patent rights or copyrights incident to the use in the performance of the Work or resulting from the incorporation in the Work of any invention, design, process, product or device not specified in the Conceptual Documents.

15

EXHIBIT GC-A to GENERAL CONDITIONS OF THE AGREEMENT BETWEEN OWNER AND DESIGN/BUILDER DATED _____
For use with EJCDC No. 1910-40 (1995 ed.)

*15.01 Dispute Resolution Agreement*

A. Article 15 of the General Conditions of the Contract between OWNER and DESIGN/BUILDER is amended to include paragraphs 15.01.B-15.01.F.

B. OWNER and DESIGN/BUILDER agree that they will first submit any and all unsettled claims, counterclaims, disputes and other matters in question between them arising out of or relating to the Contract Documents or the breach thereof ("disputes"), to mediation by _____ prior to either of them initiating against the other a demand for arbitration pursuant to paragraph 15.01.C through 15.01.F, unless delay in initiating arbitration would irrevocably prejudice one of the parties. Any time limits within which to file a demand for arbitration shall be suspended with respect to a dispute submitted to mediation within those same applicable time limits and shall remain suspended until 10 days after the termination of the mediation. The mediator of any dispute submitted to mediation under this Agreement shall not serve as arbitrator of such dispute unless otherwise agreed.

C. All claims, disputes and other matters in question between OWNER and DESIGN/BUILDER arising out of or relating to the Contract Documents or the breach thereof (except for claims which have been waived by the making or acceptance of final payment as provided by paragraph 13.10) will be decided by binding arbitration in accordance with _____ subject to the limitations of this paragraph 15.01. This agreement so to arbitrate and any other agreement or consent to arbitrate entered into in accordance herewith as provided in this paragraph 15.01 will be specifically enforceable under the prevailing law of any court having jurisdiction.

D. Notice of the demand for arbitration will be filed in writing with the other party to the Agreement and with the designated arbitration entity. The demand for arbitration will be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall any such demand be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

E. Except as provided in paragraph 15.01.F below, no arbitration arising out of or relating to the Contract Documents shall include by consolidation, joinder or in any other manner any other individual or entity who is not a party to this contract unless:

1. the inclusion of such other individual or entity is necessary if complete relief is to be afforded among those who are already parties to the arbitration, and

2. such other individual or entity is substantially involved in a question of law or fact which is common to those who are already parties to the arbitration and which will arise in such proceedings, and

3. the written consent of the other individual or entity sought to be included and of OWNER and DESIGN/BUILDER has been obtained for such inclusion, which consent shall make specific reference to this paragraph; but no such consent shall constitute consent to arbitration of any dispute not specifically described in such consent or to arbitration with any party not specifically identified in such consent.

F. Notwithstanding paragraph 15.01.E, if a claim, dispute or other matter in question between OWNER and DESIGN/BUILDER involves the Work of a Subcontractor, Supplier or Engineer either OWNER or DESIGN/BUILDER may join such entity as a party to the arbitration between OWNER and DESIGN/BUILDER hereunder. DESIGN/BUILDER shall include in all subcontracts required by paragraph 6.05.D a specific provision whereby the Subcontractor consents to being joined in an arbitration between OWNER and DESIGN/BUILDER involving the Work of such Subcontractor. Nothing in this paragraph 15.01.F nor in the provision of such subcontract consenting to joinder shall create any claim, right or cause of action in favor of Subcontractor, Supplier or Engineer against OWNER.

16